UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Crim. No. 18-305 (JRT/BRT)

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) **PLEA AGREEMENT** |
| v. | ) |
| WAYNE ROBERT DAHL, JR., | ) |
| Defendant. | ) |

The United States of America and defendant Wayne Robert Dahl, Jr. agree to resolve this case on the terms and conditions that follow. This plea agreement binds only the defendant and the United States Attorney's Office for the District of Minnesota. This agreement does not bind any other United States Attorney's Office or any other federal or state agency.

1. **Charges**: The defendant agrees to plead guilty to Count One of the Indictment, which charges the defendant with mail fraud, in violation of 18 U.S.C. § 1341. Defendant fully understands the nature and elements of the crimes with which he has been charged.

2. **Factual Basis**. Defendant will plead guilty because he is in fact guilty of the charge contained in Count One of the Indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt and constitute relevant conduct pursuant to Guidelines § 1B1.3:

Defendant Wayne Robert Dahl, Jr. was the owner and Chief Executive Officer of Your Magazine Service, Inc., a Minnesota corporation in the business of selling



SCANNED
JUL 20 2020
U.S. DISTRICT COURT MPLS

magazine subscription packages to customers throughout the United States. Your Magazine Service operated a call center in Chaska, Minnesota.

Dahl ran Your Magazine Service as a fraudulent telemarketing company. Dahl and his company defrauded consumers by tricking them into signing up for costly magazine subscriptions through false and fraudulent representations and sales tactics. Dahl purchased lists of consumers who had active magazine subscriptions through other companies. Dahl knew that many of the consumers on these lists were elderly and susceptible to fraudulent and deceptive sales tactics. Dahl nevertheless had his sales employees cold-call the people on these lists and fraudulently sign them up for expensive magazine subscription packages.

Dahl directed his employees to use scripts that contained false and fraudulent representations designed to trick consumers into unwittingly signing up for costly magazine subscription packages.

Dahl's scripts directed his employees to falsely represent that his company, which he misleadingly named "Your Magazine Service," was the consumers' existing magazine provider. Dahl's script further directed his employees to falsely claim that the purpose of their call was to provide a one-time $150 credit on the consumer's existing account. In reality, as Dahl well knew, most of the consumers did not have an existing magazine subscription with Your Magazine Service and Dahl's employees were calling consumers not to offer them a credit on their account, but to trick them into signing up for new magazine subscription packages.

Through his scripts, Dahl directed his employees to fraudulently obtain consumers' credit card information by falsely claiming that the company was conducting a survey on credit card and banking usage. In reality, Dahl's company was not conducting a survey and Dahl directed his employees to obtain this information so it could be used to bill consumers for magazine subscription packages they did not want and did not realize they were purchasing.

After the consumer's credit card information had been obtained, Dahl's scripts directed a "closer" to get on the call in order to complete the process of fraudulently inducing the consumer to sign up for a new magazine subscription package. Dahl's script directed the closer to pretend to be a supervisor who wanted to ensure that the initial telemarketing employee was polite and courteous during the call.

Dahl's scripts directed the closer to begin by again falsely stating that the purpose of the call was to offer the consumer a $150 credit on their existing magazine subscription account. Through his scripts, Dahl then directed the closer to confirm the consumer's credit card number and identifying information by falsely claiming that this information was needed in order to process the $150 credit on their account. Again, this was not true. In reality, Dahl directed the closer to confirm the consumers' credit card information so that Dahl's company could bill them for new magazine subscription packages.

Dahl then directed his employees, through his scripts, to trick consumers into signing up for an expensive magazine subscription package. Dahl's script did this by falsely suggesting that Your Magazine Service was only crediting the consumer's

account in a way that reduced their existing account balance when the company was actually signing the consumers up for a new subscription package. Specifically, Dahl's script directed his employees to say the following, which Dahl knew to be fraudulent and untrue:

> And it looks like your monthly payments are set at $49.90. That hasn't changed any. The only thing that's changed is we knocked three payments off so you only have 20 payments remaining, and once those 20 payments are made, you'll have everything paid in full.

In reality, Dahl's company did not have an existing relationship with these consumers and they did not have any monthly payments. Unbeknownst to the consumers, Dahl's employees—acting at Dahl's direction—signed them up for new magazine subscription packages at a price of 20 payments of $49.90, which resulted in a total cost of $998.

Dahl directed employees to record a final portion of the call during which employees "confirmed" that the consumers were purchasing a new magazine subscription package. Dahl instructed his employees to record only this final portion of the call, and not to record the earlier portion of the call where they falsely represented that consumers would be receiving a $150 credit and not incurring any new charges. Dahl told his employees to bulldoze through this final portion of the call in order to make the "sale," even when the consumers were confused and did not realize they were signing up for new magazine subscription packages. If consumers asked questions or challenged the new charges, Dahl had his employees stop recording and start over with false assurances that the customers would only be receiving a reduction on their existing account and would not be incurring any new

4

charges. Dahl later used these selective recordings when consumers challenged the charges and claimed they had not signed up for magazine subscription packages through his company.

Dahl also gave his employees a "rebuttal script" for use in responding to consumers' questions. Dahl's rebuttal script directed his employees to provide false and fraudulent responses to consumers' questions. For example, if a consumer stated that he or she did not want more magazines, Dahl's script directed employees to falsely state "Oh, this isn't for any more. This is for what you're already getting."

Dahl and his company used the U.S. Postal Service to carry out his scheme, including to send out payment invoices and collections letters to customers with past-due accounts. On or about June 23, 2014, for example, Dahl sent or caused to be sent a letter from the Collections Manager at Your Magazine Service to Individual NR stating that a $106.01 payment was due to Your Magazine Service by July 10, 2014.

Dahl's company used these fraudulent sales tactics to sell magazine packages to more than 13,000 people across the United States. Dahl and his company received more than $11 million from their victim-customers for these magazine subscription packages.

3. **Waiver of Pretrial Motions.** The defendant understands and agrees that he has certain rights to file pretrial motions in this case. As part of this plea agreement, and based upon the concessions of the United States contained within this plea agreement, the defendant knowingly, willingly and voluntarily agrees to

give up the right to file pretrial motions in this case and agrees to withdraw any motions previously filed.

4. **Statutory Penalties**. Defendant understands that Count One of the Indictment carries the following statutory penalties:

a. Count One carries a maximum sentence of 20 years in prison. This offense carries a maximum fine of $250,000, twice the gross gain from the offense, or twice the loss caused others by the offense, whichever is greatest. Defendant further understands that the judge may impose a term of supervised release of not more than 3 years.

b. In accordance with 18 U.S.C. § 3013, defendant will be assessed a $100 special assessment on each charge to which he is pleading guilty, in addition to any other penalty imposed.

5. **Additional Consequences**. The defendant understands that as a result of his conviction, he could be assessed the costs of prosecution and additional consequences such as loss of the right to carry firearms, the right to vote, and the right to hold public office.

6. **Revocation of Supervised Release**. The defendant understands that if he were to violate any condition of supervised release, the defendant could be sentenced to an additional term of imprisonment up to the length of the original supervised release term, subject to the statutory maximums set forth in 18 U.S.C. § 3583.

7. **Guideline Calculations.** The parties acknowledge that the defendant will be sentenced in accordance with 18 U.S.C. § 3551, *et seq.* Nothing in this plea agreement should be construed to limit the parties from presenting any and all relevant evidence to the Court at sentencing. The parties also acknowledge that the Court will consider the United States Sentencing Guidelines in determining the appropriate sentence and stipulate to the following guidelines calculations.

8. For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

### COUNT ONE

a. <u>Base Offense Level</u>. The parties agree that the base offense level for Count One is 7 pursuant to Guidelines § 2B1.1(a).

b. <u>Specific Offense Characteristics</u>. The parties agree that the offense level should be increased 20 levels pursuant to Guidelines § 2B1.1(b)(1)(K) because the total loss was more than $9.5 million but less than $25 million.

c. The parties agree that the offense level should be increased 2 levels pursuant to Guidelines § 2B1.1(b)(2)(A) because the offense involved 10 or more victims and was committed through mass-marketing.

d. <u>Chapter 3 Enhancements</u>. The parties agree that the offense level should be increased 4 levels pursuant to Guidelines §§ 3A1.1(b)(1) and (2) because the defendant knew or should have known that a victim of the offense was a vulnerable victim and the offense involved a large number of vulnerable victims. The parties further agree that the offense level should be increased 4 levels pursuant

to Guidelines § 3B1.1(A) because the defendant was the organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.

      e.    <u>Acceptance of Responsibility.</u> The government agrees to recommend that the defendant receive a 2-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a). As the defendant has timely notified the government of his intention to enter a plea of guilty, the government agrees to recommend that the defendant receive an additional 1-level reduction pursuant to U.S.S.G. § 3E1.1(b). Whether these reductions will be imposed shall be determined by the Court in its discretion. However, the defendant understands and agrees that the government's recommendations are conditioned upon the following: (1) the defendant testifies truthfully during the change of plea and sentencing hearings; (2) the defendant cooperates fully with the United States Probation Office in the pre-sentence investigation; and (3) the defendant engages in no conduct inconsistent with acceptance of responsibility before the time of sentencing. The parties agree that no other Chapter 3 adjustments apply.

      f.    **Criminal History Category.** Based on the information available at this time, the Parties believe that the defendant falls in criminal history category III. This does not constitute a stipulation, but a belief based on an assessment of the information currently known. The defendant's actual criminal history and any related status will be determined by the Court based on the information presented in the presentence investigation and by the parties at the time of sentencing. The defendant understands that if the presentence investigation

reveals any prior adult or juvenile sentence which should be included within his criminal history under the U.S. Sentencing Guidelines, the defendant will be sentenced based on his true criminal history category, and he will not be permitted to withdraw from this Plea Agreement. U.S.S.G. § 4A1.1.

    g. **Guidelines Range**: Therefore, based on the facts now known to the government, the parties agree that the anticipated offense level is 34, which, when combined with the anticipated criminal history category of III results in an anticipated advisory sentencing guidelines range of 188 to 235 months in prison, in addition to any supervised release, fine, and restitution the Court may impose.

    h. **Fine Range**. If the adjusted offense level is 34, the Sentencing Guidelines fine range is $35,000 to $350,000. U.S.S.G. § 5E1.2(c)(3).

  9. **Discretion of the Court**. The parties understand that the Sentencing Guidelines are advisory and their application is a matter that falls solely within the Court's discretion. The Court is neither a party to nor bound by this plea agreement and may make its own determination regarding the applicable Guidelines factors and the applicable criminal history category. The Court may also depart from the applicable Guidelines range, and may impose a sentence up to the maximum penalties as set forth above. If the Court determines that the applicable guideline calculations or the defendant's criminal history category are different from that stated above, the parties may not withdraw from this agreement, and the defendant will be sentenced pursuant to the Court's determinations.

10. **Agreements Related to Sentencing.** The parties are free to recommend whatever sentence they deem appropriate. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

11. **Remaining Counts.** After sentence has been imposed on the counts to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the Indictment.

12. **Forfeiture.** The defendant agrees to forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to Count 1 of the Indictment. The United States reserves its right to seek the direct forfeiture of specific assets, a money judgment forfeiture against the defendant, and the forfeiture of substitute property pursuant to 21 U.S.C. § 853(p).

13. **Special Assessment.** Defendant agrees to pay the $100 special assessment to the Clerk of the U.S. District Court at the time of sentencing.

14. **Restitution.** Defendant understands and agrees that the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A, applies and that the Court is required to order the defendant to make restitution to the victims of his crime.

15. Defendant agrees that he owes restitution in the amount of $10,564,309. Defendant will fully and completely disclose to the United States Attorney's Office the existence and location of any assets in which the defendant has any right, title, or interest, or over which the defendant exercises control, directly or indirectly, including those assets held by a spouse, nominee or other third party, or

any business owned or controlled by the Defendant. Defendant agrees to assist the United States in identifying, locating, returning, and transferring assets for use in payment of restitution fines, and forfeiture ordered by the Court. Defendant agrees to complete a financial statement within two weeks of the entry of his guilty plea. The defendant further agrees to execute any releases that may be necessary for the United States to obtain information concerning the Defendant's assets. If requested by the United States, the Defendant agrees to submit to one or more asset interviews or depositions under oath.

16. **Waivers of Trial Right**. The defendant understands that he has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial. Defendant understands that by pleading guilty he surrenders this right.

17. **Waivers of Appellate Rights**. The defendant understands that 18 U.S.C. § 3742 affords the defendant the right to appeal the sentence imposed in this case. Acknowledging this right, and in exchange for the concessions made by the United States in this plea agreement, the defendant hereby waives all rights conferred by 18 U.S.C. § 3742 to appeal. In addition, the defendant expressly waives the right to petition under 28 U.S.C. § 2255. However, the waivers noted above shall not apply to a post-conviction collateral attack or direct appeal based on a claim of ineffective assistance of counsel. The defendant has discussed these rights with the defendant's attorney. The defendant understands the rights being waived, and the defendant waives these rights knowingly, intelligently, and voluntarily.

18. **Waiver of Freedom of Information Act and Privacy Act.** The defendant waives all rights to obtain, directly or through others, information about the investigation and prosecution of this case under the Freedom of Information Act and the Privacy Act of 1974, 5 U.S.C. §§ 552, 552A.

19. **Complete Agreement.** This, along with any agreement signed by the parties before entry of the plea, is the entire agreement and understanding between the United States and the defendant.

20. Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

21.     Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

Date: July 20, 2020

ERICA H. MACDONALD
United States Attorney

BY: JOSEPH H. THOMPSON
HARRY M. JACOBS
MELINDA A. WILLIAMS
Assistant U.S. Attorneys

Date: 7-20-20

WAYNE ROBERT DAHL, JR.
Defendant

Date: July 20, 2020

PETER B. WOLD
AARON J. MORRISON
Counsel for Defendant